# Ex Parte FREDERICK W. BROCKMAN, Petitioner.

### In Banc, March 2, 1911.

1. **HABEAS CORPUS: Commitment of Witness: Merits of Principal Case.** Upon a petition for a writ of *habeas corpus* to discharge a witness committed by a commissioner for refusing to testify by deposition, it would be highly improper to pass directly or indirectly upon the merits of the suit in which his evidence was sought, or the good faith or ulterior purpose of those bringing it. The fact of detention and custody, and, if found to exist, the lawfulness of it, is the controlling issue in *habeas corpus*.

2. ————: ————: **Attorneys in Principal Case.** It is proper to permit the attorneys of the party who sought to take the witness's deposition, to appear as attorney for respondent in the witness's *habeas corpus* hearing.

3. ————: ————: **Form of Commitment: To Sheriff and Jailer.** Where the writ of *habeas corpus* finds the petitioner in the sheriff's hands and he alone is the respondent, the court will not assume to decide that the commitment directed to both the sheriff and jailer (two separate officers) is lacking in "some matter of substance," for the question of whether or not the jailer could, under such a commitment, justify his holding of petitioner, is not for decision.

4. ————: ————: ————: **Defective: When Raised.** On the coming in of the officer's return, which must include the warrant of commitment, petitioner should move for his discharge because of a defective warrant, or at least he should raise the issue of a defective warrant in his petition or reply to the return, else he will not thereafter be heard to urge that it is defective.

5. ————: ————: **Not Sworn.** Where a witness has been sworn once before the commissioner it is not necessary that he be sworn again when he appears in response to a subsequent subpoena to testify in the same cause.

6. ————: ————: **Appointment of Commissioner: Admitted by Pleadings.** Where petitioner's petition in *habeas corpus* runs on the theory that the commissioner had been appointed by the circuit court to take testimony and had taken upon himself the burden and powers of such appointment, petitioner will not thereafter be heard to contend there is nothing to show that the commissioner was appointed. Facts admitted by pleadings need no proof.

7. ——————: ——————: **Refusing to Testify: Before Commissioner.** A party subpoenaed to appear before a duly appointed commissioner and testify on behalf of his adversary cannot defy the authority of the commissioner and refuse to testify; and if he does, he may be legally committed for contempt. The circuit court had appointed a commissioner to take testimony in a cause wherein petitioner was defendant, and petitioner was called as a witness for plaintiffs, was sworn, and testified; at the close of the examination counsel for plaintiffs announced that he was through with the witness for the present, but that he wanted to examine him further as soon as he could prepare and file an amended petition; petitioner's counsel insisted that the commissioner discharge the witness, and he did so; shortly thereafter an amended petition was filed, and a motion was made to strike it out, which motion is still pending; thereafter plaintiffs applied verbally to the commissioner for a subpoena for petitioner, which was issued, and served two days before he was required to appear; disobeying the subpoena, an attachment was issued and he was arrested and brought before the commissioner, who required him to testify and to be sworn for that purpose, but he refused to be sworn and refused to testify or answer any questions, and while a pertinent question was being asked him, pleading stress of business, he left the room; and thereafter, on plaintiffs' application, the commissioner issued a commitment, remanding him to jail until he appeared and testified. *Held*, that petitioner is not entitled to be discharged, but his commitment was proper.

8. **TAKING DEPOSITION OF ADVERSARY.** The provisions of the statute relating to the taking of depositions *de bene esse* are in the nature of the old chancery practice relating to a bill of discovery, entitling a party to sift the conscience of his adversary.

Habeas Corpus.

PETITIONER REMANDED.

*Chas. B. Stark* for petitioner.

(1) A party, having once taken the deposition of his adversary, cannot, at mere will, invoke the processes of the law to compel him to submit to further examination, but must show a substantial reason to the court having jurisdiction of the cause, and obtain its order permitting such further examination. Kirby v. Cannon, 9 Ind. 371; Addelman v. Swartz, 22 Ind. 251; Booth v. McJilton, 82 Va. 827; Carter v. Ed-

monds, 80 Va. 58; Faut v. Miller, 17 Gratt. 188; Newman v. Kendell, 2 A. K. Marsh. (Ky.) 236. Such is the reasonable interpretation of the statute law of this State. R. S. 1909, secs. 6384, 6356, 6361, 6390; Matthews v. Railroad, 142 Mo. 669. (2) The plaintiffs in the case of Link v. Brockman, not taking the depositions of the defendants therein in good faith "to be used in such case" as evidence, were guilty of abuse of the processes of the law, and the petitioner had the right to refuse to submit to such abuse. Ex parte Krieger, 7 Mo. App. 367; Matthews v. Railroad, 142 Mo. 645. (3) The warrant of commitment, by virtue of which the petitioner is restrained of his liberty, is void, because it is directed to both the sheriff and jailer of the city of St. Louis, commanding the jailer to make an arrest and the sheriff to keep the petitioner in jail, whereas the one has no lawful right to make an arrest and the other has no control or authority over the jail. St. Louis City Charter, art. 4, secs. 2, 28; Woerner's Rev. Code (1907), pp. 345, 916; 2 R. S. 1899, p. 2490, sec. 9; Laws 1877, p. 188, sec. 1; Walker v. Vick, 2 Dev. & Bat. (N. C.) 99; Siler v. McKee, 2 Jones's Law (N. C.) 380; Finley v. Smith, 4 Dev. (N. C.) 95; 3 Chit., Pr. 185-188; Grant v. Bagge, 3 East 128; Bowring v. Pritchard, 14 East 289; Bradshaw v. Davis, 1 Chit. R. 374; Storr v. Mount, 2 Dowl. 417. "The forms of a writ, the execution of which has so important an operation as to deprive a citizen of his liberty, are so many securities for the liberty of all citizens." Finley v. Smith, 4 Dev. (N. C.) 95. (5) It is not safe for the courts to allow any substantial departure from the form of the writ of commitment which has so long been in use in this State. Ex parte O'Brien, 127 Mo. 486; Ex parte Hollwedell, 74 Mo. 397; R. S. 1909, p. 3769, forms 161, 162; R. S. 1909, sec. 4996; R. S. 1855, pp. 1653, 1654; Finley v. Smith, 4 Dev. (N. C.) 95. (6) The warrant in this case is one which the deposition officer is not authorized to

issue, for it contains both a *capias* or attachment and a *mittimus* combined in one warrant, whereas the law authorizes an attachment to be issued only to bring a witness disobeying a subpoena before that officer, but not to take him elsewhere, and it only authorizes a commitment of a witness when "attending who shall refuse to give evidence." R. S. 1909, secs. 6367, 6372, 6404. (7) The evidence taken in this proceeding shows that the recitals of the warrant are untrue and the mere statement of facts contained therein does not conclude the petitioner. R. S. 1909, sec. 2468; Ex parte O'Brien, 127 Mo. 489; Ex parte Krieger, 7 Mo. App. 367; Welsh v. Nash, 8 East 403. (8) The special commissioner, not being an officer, had no power to take the deposition of the petitioner unless prior thereto he had received a *dedimus* from the circuit court. Since that fact does not affirmatively appear the imprisonment is unauthorized. In re Nitsche, 14 Mo. App. 213; Ex parte O'Brien, 127 Mo. 477; State v. Swope, 72 Mo. 403; Railroad v. Campbell, 62 Mo. 585. (9) The special commissioner appointed in this proceeding committed error in allowing the plaintiffs in the case of Link v. Brockman to intervene, for the only parties who have a right to appear in a *habeas corpus* matter are the petitioner and the respondent. In re Wakker, 3 Barb. (N. Y.) 168. (10) The petition in the case of Link v. Brockman, based on section 3364 of the Revised Statutes, did not state a cause of action, because it stated only personal grievances, not facts bringing it within the provisions of the statute of which the corporation itself could have complained. Vogeler v. Punch, 205 Mo. 574.

*George Safford* for intervenors.

(1) The sections of our statutes pertaining to the taking of the depositions of witnesses and of parties were designed as a substitute for the ancient chan-

cery practice in regard to interrogatories appended to a bill, and had the same object in view, which was to give the party an opportunity to sift the conscience of his adversary. Eck v. Hatcher, 58 Mo. 239; Larimore v. Bobb, 114 Mo. 453; Devoy v. Railroad, 192 Mo. 220. (2) It is for the notary before whom the deposition is taken, to decide whether a question is relevant or material, and if he decides it to be such, the witness must answer it. Ex parte Gfeller, 178 Mo. 248; Ex parte McKee, 18 Mo. 599. (3) A special commissioner, appointed by a circuit court of this State to take depositions, after having wrongfully excused a witness over the objection of the party calling him and over the exceptions of such party saved at the time, has the power to review his ruling and recall the witness at any time before the deposition of the witness has been signed and sworn to, while depositions are regularly taken at a time and place agreed upon by the parties during the life of his commission. (4) A writ issued by a special commissioner duly appointed, having jurisdiction, commanding the sheriff to do an act which the law authorizes the sheriff to do when so commanded, is sufficient authority to justify the sheriff in executing such writ to the extent of his statutory duty. (5) The commitment in this case does not necessarily deprive the petitioner of his liberty, but, taken in connection with Sec. 6404, R. S. 1909, simply requires the sheriff to commit him to jail until he gives the required testimony; in other words, requires him to give the testimony or be confined in jail. (6) The plaintiffs in the case of Link v. Brockman have a right to be heard in this proceeding, because their right to the testimony of Brockman is directly involved. Otherwise the disinterested sheriff might permit the matter to go by default and thereby deprive the plaintiffs of their right to the testimony of Brockman. (7) The remedies prayed for by plaintiffs in their petition in the case of Link v.

Brockman, are authorized by Secs. 3364, 3365 and 3366, R. S. 1909. (8) The plaintiffs, upon filing their amended petition, the contents of which the special commissioner was presumed to know, and did know, had the right to complete the taking of the depositions. (9) Surplusage does not invalidate a commitment. 9 Cyc. 50-51. (10) Direction of commitment to sheriff and jailer does not invalidate. 9 Cyc. 51; Ex parte Branigan, 19 Cal. 133.

LAMM, J.—Brockman (in the custody of Nolte, sheriff of St. Louis) sued out a writ of *habeas corpus.* By virtue of the order of Fox, C. J., he was admitted to bail pending hearing. The writ commanded said sheriff to produce his body at our bar, together with the time and cause of his imprisonment. By stipulation he waived the production of his body, agreeing to hold himself ready and willing to submit to our orders in the cause and to be dealt with according to law. The sheriff made return and petitioner answered. Subsequently, on motion, John A. Blevins, Esq., of the St. Louis Bar, was appointed special commissioner to take testimony, make a finding of facts and report on a day certain. He, having qualified, obeyed our order, and the cause is submitted upon the petition (including exhibits), the return, answer, report of our special commissioner, petitioner's exceptions thereto, arguments *ore tenus* by counsel for petitioner and on behalf of certain parties designated as intervenors, and on briefs.

The case seeks the gist of the pleadings and exhibits, viz.:

The petition alleges that in May, 1910, there was a corporation doing business in St. Louis named the Lightning Lunch Company; that one McGregor with Gregg and Brockman were its directors—Brockman, president; Gregg, vice-president, and McGregor, secretary—that McGregor and Link brought suit against

Brockman, Gregg and the Lunch Company in the St. Louis Circuit Court, the petition not stating facts sufficient to constitute a cause of action (a copy thereof being annexed to show that fact); that presently McGregor and Link gave notice to defendants of an application for a preliminary injunction, restraining Brockman and Gregg from discharging their duties as directors and officers; that the latter appeared thereto, whereat the application was postponed. Presently, McGregor and Link served notice to take depositions before a notary public and sued out a subpoena for Gregg and Brockman to appear and testify; that upon counter notice by Brockman, Gregg and the Lunch Company, the court appointed Leighton Shields, Esq., special commissioner to take depositions; that thereupon defendants filed their separate answers (which answers are attached); that the depositions of petitioner and Gregg were taken in shorthand and petitioner was "discharged" by the commissioner—he ruling on questions of evidence so as to confine the examination within the issues on the pleadings as he interpreted them; that, presently, on June 7th, Link and McGregor filed an amended petition, joining Selleck as coplaintiff (said amended petition is annexed); that defendants filed a motion to strike out the amended petition (which motion is annexed); that said motion is undisposed of; that after said events, the special commissioner issued a new subpoena for Brockman and Gregg, upon demand of plaintiffs, to appear for the purpose of having their depositions taken; that no application was made to the circuit court and no cause shown to said court or the special commissioner for the taking of said depositions and no leave was obtained therefor from either; that plaintiffs proceeded on the theory they had the right to compel the attendance of petitioner before said commissioner as often as their "whims and caprices dictated;" that petitioner having freely and willingly submitted in the

first instance to the taking of his deposition and believing his duty was done, unless some reason be assigned to the court as a basis for requiring him to leave his business and submit to further examination, disobeyed the subpoena; and that, thereupon, the special commissioner upon plaintiffs' application issued an attachment for said petitioner to the sheriff of St. Louis— which attachment was issued over the protest of petitioner's counsel and is attached as an exhibit. Thereat the sheriff brought petitioner before the special commissioner on the attachment, and the latter ruled that the plaintiffs could retake the deposition of petitioner without first obtaining leave from the circuit court or from the special commissioner; that petitioner refused to submit to the retaking of his deposition without a reason having been given to or leave obtained from the court or commissioner, whereupon the commissioner issued to the sheriff of the city of St. Louis a warrant of commitment, commanding that petitioner be arrested and be committed to jail until he shall submit himself to the "unlawful order of the commissioner," which warrant of commitment is also annexed; that petitioner is unlawfully deprived of his liberty by Nolte, sheriff aforesaid; that his imprisonment is illegal in this, that the special commissioner is permitting plaintiffs in that suit to grossly abuse the process of the law and of said court and in so doing has exceeded his jurisdiction and authority; that the suit in which the depositions were being taken was brought after McGregor had demanded of petitioner that he buy McGregor's stock in the Lunch Company; that on the refusal to buy such stock McGregor notified him he would apply to the circuit court to have him removed from all participation in the affairs of the company as director and president, and the suit was subsequently brought pursuant to such threat to vex and annoy petitioner into submitting to McGregor's demand; that the taking of the depositions of petitioner and Gregg

at first, and the attempt to retake them, is not for the purpose of obtaining evidence to be used in said cause but for the purpose of vexing, annoying and harassing petitioner and Gregg, and to try to secure information on which plaintiffs hope to make a case under some future amendment of their pleadings; that it is an unlawful attempt to use the law applicable to taking depositions in the place of a bill of discovery and is a gross abuse of process, in that the process is misused for the private ends of McGregor to force petitioner to purchase stock of McGregor, Link and Selleck—the said Link being McGregor's brother-in-law and the said Selleck his attorney.

The original petition in the suit of Link et al. v. Brockman et al., attached, as said, as an exhibit, shows the Lightning Lunch Company has a capital stock of $30,000, divided into 300 shares, and is governed by a board of three directors, and complains of the acts committed by Gregg and Brockman at a certain annual election and more particularly of the acts of Brockman committed at said election and subsequently; that on or about the time of said election Link owned 82 and McGregor 53 shares of stock; that of the 165 remaining shares the corporation itself held 35 of them in trust and Brockman owned 130 shares; that for a long time McGregor and Link, by virtue of owning said 135 shares, had a controlling voice in the company's affairs and in the election of three directors; that at a former time McGregor, Brockman and one Kroeger were directors; that sometime in 1907, Finch, the owner of 15 shares, surrendered them to the company in consideration of the sum of $700 paid him out of the corporation's funds and his shares were thereby cancelled; that in September, 1908, one Stevens owned 20 shares and at that time surrendered them to the company on the payment to him out of the funds of the company of about $1100 and the said 20 shares were thereby cancelled; that Link purchased Kroeger's

shares in 1909, who then resigned from the director-
ate and such vacancy was never filled; that, subse-
quently, in December, 1909, Brockman as president
and director, without any authority from the board
and without the knowledge or consent of plaintiffs,
attempted to sell to Gregg the 35 shares of Finch and
Stevens stock, aforesaid, and did sell them to him and
unlawfully transferred them upon the books of the com-
pany to Gregg for the purpose of obtaining control
of the election of officers of said corporation, then to
be held in a few days, this without the knowledge or
consent of the other stockholders or members of the
board of directors and in disregard of their rights;
that thereupon Brockman and Gregg with unknown
parties, stockholders related to Brockman, conspired
to deprive Link and McGregor of control of the com-
pany and in pursuance thereof at a stockholders' meet-
ing held January 3, 1910, elected Brockman and Gregg
as directors, and at said election Gregg voted said 35
shares of stock, so unlawfully and fraudulently trans-
ferred to his name on the company's books against the
will of plaintiffs and without their consent; that Brock-
man, acting with Gregg and with other related stock-
holders, conspiring unlawfully and without authority
to usurp the powers and duties of McGregor, secre-
tary of the Lunch Company, and as a member of the
board, refused to permit stockholders to examine the
corporation books and willfully and maliciously dis-
regarded plaintiffs' right and withheld the seal of the
corporation and its books; that the annual meeting
of the stockholders aforesaid was illegal because Gregg
voted 35 shares of stock never legally transferred or
sold to him, because he is not a stockholder and is not
eligible to hold an office in the corporation. The pray-
er of the petition was directed to declaring the sale
and transfer of the 35 shares of stock to Gregg null
and void; and that Brockman be suspended from the
board of directors and as president, on account of said

abuse of his power as president and director; that the stockholders' election be set aside and a new one held at a time designated by the court; and that a temporary restraining order be granted against Brockman to enjoin him from performing the duties of a director or president or 'from using the corporate seal, and against Gregg restraining him from acting as director, and for such further relief as the circumstances and justice of the case seem to require, in accordance with the provisions of sections 1338 and 1340 of article 9, Revised Statutes 1899, and other provisions of the statute.

The Lightning Lunch Company filed answer (also an exhibit) making certain formal admissions and denying all other allegations.

Brockman's answer (also an exhibit) admitted the ownership of himself and his friends of 130 shares, the division of the capital stock into 300 shares; that McGregor and Link owned 135 shares. In substance, he then alleges that Gregg owns 35 shares and that at the corporate election in January, 1910, Brockman, Gregg and plaintiffs participated therein, that 300 1-2 votes were cast for Brockman at said election as director, the same number for Gregg and 299 for McGregor, and none for any other person; that McGregor voted 53 votes for Brockman and 53 for Gregg; that prior to .that time both Link and McGregor knew ''whence'' Gregg derived his title to his stock and suffered him to participate in the election as a voter without objection or challenge. He denies that plaintiffs, as stockholders, or any other stockholders, were refused permission to examine the books or that he has disregarded their rights as stockholders or has refused to deliver to McGregor the seal of the corporation or any of its books. He avers that Link and McGregor had free access to the books and took copious notes from and copies thereof; that McGregor, as secretary, was en-

233 Sup—10

titled to the possession of the seal and books of the corporation pertaining to his office, but he demanded the right to take and remove the books from the general office of the corporation, and defendant had refused to permit that to be done.

Gregg's answer to the original suit, also attached as an exhibit, among other things, alleges that on December 4, 1909, he bought his stock from his codefendant Brockman in good faith, with no notice of any infirmity in the title and paid $1500 to Brockman, being the full market value, and since that time had been in possession of said stock, enjoying the rights and privileges thereto appertaining. He then reiterates the averments of the answer of his codefendant Brockman relating to the stockholders' election in January, 1910, his participation therein without objection from Link and McGregor, and his election therein as director.

The amended petition, also attached as an exhibit, pleads title of the new plaintiff, Selleck, to 15 shares of stock by purchase in part from McGregor and in part through one Weller in May, 1910,—said Weller having purchased from McGregor. It makes allegation of the incorporation of the Lightning Lunch Company, and the ownership of stock therein, barring Selleck's stock, the same as in the original, and renews the allegations pertaining to the purchase by the Lunch Company of 35 shares of stock from stockholders prior to December, 1909, alleging that said stock thereby became and was held thereafter as "treasury stock." It then alleges, as in the original petition, the sale of said stock by Brockman to Gregg for $1500 paid to the Lightning Lunch Company; that said sale was fraudulent and without authority; that Brockman without authority delivered to Gregg certificates of stock, signed by him as president and a man by the name of Taylor as secretary; that Taylor was not secretary, but had been appointed secretary by Brockman without

authority; that Gregg accepted his certificates and shares of stock represented thereby with knowledge of the facts that Brockman was acting without authority to transfer the same to him and for the purpose of putting Brockman in control of the corporation to the exclusion of McGregor and Link; that Gregg did not buy his stock in good faith, for the purpose of a *bona fide* ownership, but for the purpose of holding the same in trust for Brockman and enabling Gregg to appear to be the true owner and become a director; that Taylor was appointed secretary unlawfully and wrongfully by Brockman without any authority on his part and acted as secretary in and about the transfer of stock and execution of stock certificates, through Brockman's fraudulent and wrongful permission. The petition then goes on in detail to make allegations, giving dates, to the effect that Brockman wrongfully, unlawfully and fraudulently refused McGregor, as secretary of the corporation, to possess and inspect the books of the company, although McGregor during business demanded the same of Brockman, who had the books in his custody and control, and makes a similar allegation to the effect that Brockman denied Selleck, a stockholder, under similar circumstances the right to inspect the books and corporate papers on demand. It charges unlawful and fraudulent conduct upon Brockman and Gregg in voting and permitting the voting of the 35 shares of treasury stock, charges that Gregg and Brockman knew that Gregg was not a lawful stockholder; that they wrongfully and fraudulently caused and permitted Gregg to be elected so that Brockman through his close friendship might control and manage the company's business against the wishes and contrary to the interests of plaintiffs. It charges that the stockholders' meeting was void because Gregg voted the said shares of stock and because he was elected a director when he was not a stockholder; that, subsequently, Brockman wrongfully and fraudulent-

ly caused to be paid to himself $250 a month without consideration out of the company's funds; that, subsequently and before the suit, Gregg unlawfully and wrongfully and fraudulently returned to Brockman the said 35 shares of stock for a consideration of $1500; that said Gregg, though never a stockholder, continues to act as a director; that at the annual meeting in 1909 of the directors Brockman was elected president, and at said void election of 1910 was elected director, and at a void election subsequently was re-elected president. The prayer of the amended petition is substantially the same as in the original.

Other exhibits attached to the petition for a *habeas corpus*, are the motion to strike out the amended petition, the attachment issued by Commissioner Shields, commanding the sheriff to attach Brockman's body and have him before the commissioner on the 14th day of June, 1910, to testify in the case. We do not consider the contents of either material.

The warrant of commitment under which petitioner was arrested, also attached as an exhibit, is long and need not be set forth. The only question made in regard to it in petitioner's brief will be considered presently.

By the return to our writ, the sheriff justifies his arrest and custody of Brockman under a warrant of commitment issued by Commissioner Shields on June 14, 1910, commanding the attachment of the body of Brockman, his commitment to the jail of the city of St. Louis and safe keeping, without bond, until he should give evidence required of him before said commissioner or until discharged by due process of law; that on June 15, he took Brockman into custody and thereupon Commissioner Shields suspended the warrant until the forenoon of the 16th day of June, in so far as it required the prisoner to be put to jail; that on June 16, while Brockman was thus in custody, he was released on bond by virtue of our order. Setting forth

Brockman's stipulation, waiving the production of his body at our bar, the sheriff submits the matter, holding himself subject to our orders in the premises.

To that return petitioner filed a voluminous answer or reply, justifying his new pleading on the theory the facts showing his unlawful detention "do not appear sufficiently upon the face" of the sheriff's return. He then, to show his right to a discharge, undertakes to restate the allegations of his original petition. We find nothing substantially new in this reply or answer, beyond explaining a little more fully the facts and circumstances leading up to the warrant of commitment and characterizing the conduct of plaintiffs by epithets more inflamed and biting than those in the original petition—the substantive facts remaining the same. There is, however, a denial of one recital contained in the warrant of commitment, viz., a recital to the effect that petitioner had refused to be sworn as a witness and had failed and refused to answer questions propounded to him by plaintiffs' counsel. He avers that he did not refuse to be sworn, and that said questions were simply "talked" into the record after petitioner had left the presence of Commissioner Shields, and were not propounded to or heard by petitioner.

With pleadings in the fix outlined, we appointed John A. Blevins, Esq., our special commissioner, to take proof and report the testimony with his finding of fact. He took testimony, including that taken before Commissioner Shields (also submitted here) covering, say, 600 pages of typewriting, and reported his finding of fact.

On the coming in here of his report, petitioner filed a score of exceptions thereto. On the argument at our bar, we had these exceptions, the pleadings and their exhibits, the return report, etc., together with a paper writing labeled, "Suggestions in reply to petition for writ of Habeas Corpus" filed by attorneys for

plaintiffs in the principal suit and who intervene on behalf of their clients. Also a manuscript brief by petitioner's counsel. After argument and submission, we were furnished with exhaustive printed briefs by petitioner's attorney and by said attorneys in the principal suit. Petitioner's brief makes nineteen points against the validity of his arrest and detention.

Attending to the report of our special commissioner, he found many facts germane to the principal suit and tending to prove or disprove the allegations of the petition and answers in that suit, all of which we omit for reasons presently given. He found the suit of Link et al. v. Brockman et al. was pending in the circuit court of the city of St. Louis on a petition containing the allegations hereinbefore outlined; that answers were filed of the character we have stated; that notice was given of the taking of depositions and that such proceedings were had as resulted in the appointment by the circuit court of Leighton Shields as special commissioner to take them; that he, under that authority, proceeded in due course with the taking of the depositions; that petitioner, among others, was called as a witness by plaintiffs, was examined and his examination taken in shorthand; that at the close of his examination, plaintiff's counsel announced he was through with the witness for the present, but that he wanted to examine him further as soon as he could prepare and file an amended petition; that counsel for Brockman then insisted that Commissioner Shields should discharge the witness and he did so; shortly thereafter an amended petition was filed in the cause (an abstract of which has been heretofore given); that a motion was then filed to strike it out, which motion is pending; that afterwards plaintiffs applied verbally to Commissioner Shields for a subpoena for Brockman, which was issued and served, requiring him to appear at a place and time certain; that Brockman disobeyed the mandate of this subpoena and an attachment was

issued for him; that he was arrested thereon by the sheriff and brought before the commissioner, who then required him to testify as a witness in the cause and to be sworn for that purpose; that Brockman refused to be sworn, refused to testify or answer any questions put to him, and, over the objections of Commissioner Shields, left the room while a question was being asked of him by plaintiffs' counsel, saying he had important business; that Brockman's refusal to remain in the presence of the commissioner prevented him from hearing the completion of the question then being asked and prevented him from hearing the other questions following, which were incorporated into the record to show the character of the questions counsel desired to ask; that afterwards, on plaintiffs' application, Commissioner Shields issued a commitment, committing Brockman to jail for contempt until he shall appear and testify in said cause or until he be discharged by the courts; that no application was made to the circuit court for permission to re-examine Brockman as a witness; that at the time Commissioner Shields had Brockman brought before him and required him to be sworn and to testify he, the commissioner, was in regular session on the day and at the place to which he had regularly adjourned and the parties and their attorneys were present before him at the time; that he was acting in good faith in taking evidence at the time for use at the trial and not for the purpose of harassing or annoying defendants or either of them; that Mr. Safford was employed as plaintiffs' counsel in the principal suit and had charge of that case and that his actions had been fair and without cause for criticism; and that the principal suit was being prosecuted in good faith.

Any other facts necessary to the determination of any vital question will appear in the opinion in connection with the consideration and determination of the question itself.

I.   Of the scope of the investigation (and herein of matter not germane).

(a).   The vast volume of this record bespeaks a foreword by way of preliminary ruling.   Nearly all the testimony taken by Commissioner Blevins, as well as that taken by Commissioner Shields (also here, as said), and many of the findings of Commissioner Blevins, go directly to the merits of the principal suit and were leveled at proving or disproving the issues in that suit.   The same is true of the majority of the exceptions made to the report of our commissioner.   The same is true of some of the propositions advanced in petitioner's brief and argument.   The principal suit is not here on its merits.   To draw those merits into this controversy, to comment on them or adjudicate them, *by way of parenthesis* or anticipation, upon a petition for a *habeas corpus* to discharge a witness committed for contempt for refusing to testify in that case, would be untimely and prejudicial—it would make ducks and drakes of orderly procedure.   Such course would tend to foreclose the issues and embarrass the proper disposition of the principal case when its merits are reached for final disposition below.   Hence, it would be highly improper to pass directly or indirectly at this time on the merits of that suit or to be drawn prematurely into deciding even what the testimony tended to prove or disprove in that regard.   The precept is:   Nothing is permitted to a court except what is legally submitted to the court.   Applying that precept, when the great Writ of Right goes down commanding any person charged with wrongful interference with the liberty of another to bring the body with the time and cause of imprisonment, the controlling issue is:   The fact of detention and custody, and (if found to exist) the lawfulness of it.

In the petition are allegations that the original suit was brought in bad faith for sinister purposes, viz., to press a spur in petitioner's side and force him

to buy his peace by taking over the shares of stock in the Lightning Lunch Company held by recalcitrant shareholders—*recalcitrant* being a learned term (allowed to those using the venerable language of the law) interchangeable with the colloquialism, "kicking," and literally meaning kicking back. Our learned special commissioner permitted much testimony *pro* and *con* on the question of good faith, evidently on the maxim, "Abundant caution injures no one." In the absence of any directions from us on what allegations in the petition for the writ we deemed vital, he took the cautious course of treating each and every one of them as vital. To that end he let testimony in and left it for us to determine its materiality and probative force.

Attending to that phase, the good faith, the *motive* of a litigant, is not a subject of inquiry in a suit to the extent that a justice of the peace, a notary or special commissioner, charged with taking depositions, has a call to determine the good faith of the action before he can compel a witness to testify or commit him for refusal to answer competent questions. To rule otherwise, would be to inject an anxious and extraneous question in the taking of depositions to be sprung by every witness or party at any time, at his own motion. Doubtless, there are cases where the matter of good faith may guide the trial court to a just judgment on the merits, when the question arises on the whole proof, though the general doctrine is that a court has to do with legal liability alone and not with the mere motive actuating a litigant in invoking the judgment of the court on that legal liability, so long as the parties are adverse and the suit is not feigned. We are cited to no authority and know of none permitting a witness to refuse to answer a question at the taking of his deposition by springing the question of good faith in the suit. That would be an easy, self-made road of escape, when hard pressed, from giving testimony on a tender point—a road hitherto untravel-

ed, unsurveyed and not laid down on any known legal chart—one peremptorily halting the investigation in the main matter by injecting a wholly collateral one for preliminary determination.

Accordingly, we rule that petitioner's case must stand or fall on the commitment and on facts constituting the *res gestae,* viz., the facts directly leading up to the issuing of that commitment. This ruling cancels out the factor of good faith in the original suit.

Constrained by the rulings and reasons given, we put away from us all testimony, all findings of our commissioner, all exceptions to his report and all propositions advanced bearing only upon the merits of the principal suit, using the term "merits" in a sense broad enough to include the *bona fides* of that suit.

(b). There is one other preliminary matter. Before Commissioner Blevins, also here, attorneys for plaintiffs in the original suit were allowed to appear and take a substantial part in the proceeding. Below, as here, petitioner's counsel unavailingly objected to such appearance and now invites a ruling thereon. *Cui bono?* But waiving the view implied by that question, it is clear that appearance was either of grace or of right. On such premise we rule:

(1). If such appearance was as *amici curiae,* and as a matter of grace, then that grace alone concerns us. Grace doth not abound through consent of one's adversary. It droppeth, withal, like mercy—as the gentle and refreshing dews of Heaven. It goeth where it listeth.

(2). If that appearance below or here is because plaintiffs in the original suit are interested of right in this proceeding as auxiliary to and in aid of the principal suit (and counsel plant it on that theory), we can see no objection to it in reason. *Fiat lux* is a motto of universal and wholesome use. Commissioner Shields moved in the premises at the instance of the

plaintiffs. They were interested then. When did that interest cease? Furthermore, over the objection of petitioner, made orally at our bar, we permitted such counsel to argue against petitioner's discharge and file briefs. For good or ill, the thing is done. How could we now by any psychological twist known to man wring from our minds the effect of that argument and those briefs? Yet nothing less than that impossible thing would benefit petitioner a whit. The incident must be taken as closed.

The point is ruled against petitioner.

II. Of the commitment.

(a). After the venue and title of the cause, the caption of the commitment reads: "The State of Missouri, to the Sheriff of the City of St. Louis and to the Jailor of the City of St. Louis, Greeting:—" Then follow sundry whereases, reciting facts leading up to and descriptive of the contempt—the writ concluding as follows:

"NOW THEREFORE, We hereby command you, the said Sheriff of the city of St. Louis, and Jailor of the city of St. Louis, to attach the body of the said Frederick W. Brockman and commit him the said Frederick W. Brockman to the jail of the city of St. Louis and the body of him there safely keep, without bail, within the said jail of the city of St. Louis, at the expense of the said Frederick W. Brockman, until he, the said Frederick W. Brockman gives such evidence or until he be discharged by due course of law."

Learned counsel for petitioner argues in his brief that the writ is "strange to the law;" is in "hideous form," and cannot justify his client's detention—particularizing in this fashion: The writ is directed to the sheriff *and* jailor of the city of St. Louis; its commands run to those two officers; among them is one to "attach" the body; hence, the writ is bad because dual in form, containing both an attachment, a *capias,* and

a *mittimus* (the office of the one being to arrest and bring in the prisoner and the other to take him to jail); and dual in being directed to two instead of one, in that in the city of St. Louis the sheriff is one officer, the jailor another and independent one; that it commands the jailer to usurp the functions of the sheriff, thereby committing a trespass on the person of Brockman, and commands the sheriff to usurp the functions of the jailor. Under the general statutes (R. S. 1909, secs. 1573-4), the sheriff is *ex officio* jailor. By the scheme and charter of St. Louis, the sheriff and jailor are not the same officer—one is elected, the other appointed, and the jailor does not hold under the sheriff. [Art. 4, Scheme and Charter, sec. 2; 2 R. S. 1899, p. 2490.]

The propositions advanced are refined to a degree. It is obvious at a glance that the jailor of the city of St. Louis had neither the warrant nor the prisoner. Our writ did not run to him. He did nothing and threatens nothing at this time. He has not usurped the office of sheriff, nor has the latter usurped his. Petitioner seized the psychological moment when he found himself not in jail but in the sheriff's hands, not the jailor's. Therefore, even if the warrant were too broad (which we do not rule), its mere breadth has hurt no one at this time, for our writ halted the matter by a challenge to the sheriff's, not the jailor's, right to custody. The question, then, whether the jailor could justify under the writ on his physical incarceration of the prisoner, or the question whether the sheriff could justify if he, not the jailor, held the prisoner actually in jail, is not before us. On the record of this particular case, because of what follows, we need not say whether the writ is defective in "some matter of substance;" for that statutory ground of discharge (R. S. 1909, sec. 2474) is not properly before us. Observe, we are not proceeding without pleadings by the prisoner, as we have statutory power to do in an emergency. [R. S. 1909, sec. 2445.] Such a case as

that can take care of itself when we have it. In this case issues are made up by pleadings filed. Petitioner's custody is in aid of a civil right. Petitioner created the situation. He invoked his own remedy. He pitched his own battle. He presided over the facts giving birth to the warrant with deliberation and of set purpose. He was not *inops consilii*. But acted at every step on the advice of learned counsel of his own choice. Hence, we may not allow the case to ride off on the theory the commitment is defective in substance—as to that we say neither aye nor nay. Something could be said *pro* and *con* on that head. But we decline the task of weighing and applying the nice learning advanced by petitioner's counsel. This, for the reason there is no such issue in the case.

In *habeas corpus* it is the duty of the petitioner to state the facts entitling him to discharge on his best knowledge and belief. [R. S. 1909, sec. 2442.] He must show in what the illegal restraint consists and probable cause why the writ should issue. If he state no ground for relief, the writ will be denied. [*Ex parte* Roberts, 166 Mo. 207.] The return of the officer must be responsive to the writ. Among other things, the officer must produce the warrant by virtue of which he holds the prisoner. [*Ibid.*, sec. 2456.] The return is taken as true if no issue is made by denial. This, without reference to the allegations of the petition. [*Ex parte* Durbin, 102 Mo. 100.]

In the case at bar the sheriff justified under the writ. In neither the petition nor in the reply to the return of the officer did petitioner ask a discharge because the writ was defective nor did he raise any issue of law or fact of that sort. He did deny certain recitals of fact in the body of the writ, presently to be considered. That was all he had to say against the writ at that time— a time appointed by the law for him to speak and let his wants be known. The contention that the writ was strange to the law and in bad form

appears in print first in petitioner's brief, filed November 21, 1910, nearly a month after submission. In the absence of such issue in the pleadings, the contention comes too late. In the eye of the law, what did not appear there as reasons for a discharge, absent amendment (as here), did not exist, what did appear there is all that existed (*Expressio unius,* etc.).

We are relieved from serious anxiety about the foregoing disposition of the matter, because had petitioner thought to stand on the point as one of substance, he should have moved for his discharge as a matter of law on the coming in of the return and the exhibition of the alleged defective warrant of commitment. He did not do that and thereby prove his faith in his works. To the contrary, he took another road. By implication he adopted the theory the warrant was *not* defective on its face. Accordingly, he made reply and then applied for and got a special commissioner to take evidence on controverted facts. If the writ were void, as now contended, then the vast volume of testimony pouring into the case through the opening of that appointment was not only a costly and idle mummery, but laid an onerous and thankless burden on the court and counsel.

We conclude the contention is an afterthought, by way of a makeweight, or, if not an afterthought, the position was abandoned when the door was open to challenge the warrant *instanter* on its exhibition here in the return. He voluntarily closed that door by impliedly repudiating his right to enter.

(b). By his reply to the return, petitioner averred there was a false recital in the warrant to the effect that he refused to be sworn as a witness and failed and refused to answer questions propounded to him by plaintiff's counsel. He denies that he refused to be sworn and avers that the questions were *talked* into the record after he left Commissioner Shields' presence and were not propounded to or heard by him. In dis-

posing of that issue, we find the report of our commissioner to be sustained by the testimony. Petitioner was already under oath. He had been sworn in the cause, once was enough, and we shall not rule it was necessary for him to be sworn twice, but the recital in the warrant that he refused to be sworn at the time is literally true. His counsel assumed to advise him to take that course and he took it, not because he had been sworn before, but because he denied the commissioner's right to go on with the testimony. If that were all of the alleged contempt, we would have a different case to deal with. The other issue of fact raised by the reply, to the effect that petitioner heard no question and that any questions appearing in the warrant were "talked" into the record after he left the presence of the commissioner, we will consider presently.

III. It is contended there is nothing to show that Commissioner Shields was appointed to take testimony, therefore, absent a warrant of authority, a discharge must go. There is no substance in the proposition. Because:

The very petition runs on the theory Commissioner Shields was appointed by the circuit court and had taken upon himself the burden and powers of such appointment. It so alleges. The warrant recites his appointment and that recital is not denied by petitioner's reply or answer to the sheriff's return. The answer or reply reiterates the same allegation. It is a mistake to suppose that admissions count for nothing, or that the formulation of a proposition in a brief lodges a question in a case contrary to the solemn admissions of the pleadings. It is not the office of a brief to formulate the issues for the first time; that office belongs to the pleadings, and, as said, in *habeas corpus* the grounds of discharge must appear there.

We have been furnished, since the submission, with a certified copy of the appointment of Leighton Shields

as special commissioner in the form of a commission, but we brush it aside. Admitted facts need no proof.

The point is ruled against petitioner.

IV. This brings us to the main question: Was the detention of the petitioner unlawful?

We have read every line of the testimony and find it substantially sustains the facts reported by our commissioner. This petitioner, brought before a duly appointed commissioner at a time and place regularly appointed, was advised by counsel to refuse to testify. His testimony, in part, had theretofore been taken. At that prior time, under protest of adversary counsel and upon the insistence of his own, the commissioner let him go. This action of the commissioner is called a "discharge." Subsequently, the commissioner was of mind he had erred in such discharge as a finality. He caused him to be resubpoenaed, giving two days' notice. Mr. Brockman saw fit to disobey that subpoena. On a showing made by affidavit, an attachment issued and he was brought in, *willy nilly.* The commissioner was in session with a witness on the stand. That examination over, petitioner was directed to take the witness stand. There was a pother, a dramatic scene, the incidents of which may as well be left to oblivion. The upshot was that he contemptuously refused to become a witness and contemptuously, against the protest of the commissioner, left the room. He said he had business on some exchange, but we cannot shut our eyes to the fact that his business elsewhere was not a controlling factor. If he had asked in a proper way for a mere accommodating postponement of his testimony under spur of a business emergency, doubtless the commissioner would have respectfully considered that request. He planted himself on no such ground, but, having disobeyed the subpoena by advice of counsel, his counsel then and there denied the power of the commissioner to make him testify *at all,* and petitioner's

refusal was but carrying out his counsel's advice. To show the materiality of the proposed testimony, adversary counsel, while the witness was in the room, started to propound to him a question. In the middle of it, witness left. We find the question material and proper and we shall not rule that petitioner's liability to hear it, completed by fleeing the room, has any virtue whatever. If that were so a witness might put a finger in each ear and justify his refusal to testify because he did not hear. I remember but one instance of that kind allowed as valid, viz.: When Nelson, in the heat of battle and on the edge of victory, put his hand over his only good eye and said of the signal of retreat fluttering from the masthead of his commanding admiral's ship, "I can't see it." But that case is no precedent of any value in jurisprudence.

It is said that the filing of an amended petition required some order of the circuit court in the premises. We find no authority for that. We see no reason for it. The cause was pending, the court had appointed a commissioner to take testimony and that order was not restricted to one petition or another. The commissioner stood informed of the filing of the amended petition. His order to go on stood in full vigor, and petitioner was without any power to break up the commissioner's court. For aught we can see, the commissioner proceeded in strict compliance with the statute. [R. S. 1909, sec. 6356; Ibid., sec. 6404; Ibid., sec. 6384.] The provisions of the statute relating to the taking of depositions *de bene esse* are in the nature of the old chancery practice relating to a bill of discovery, entitling the party to sift the conscience of his adversary. [Eck v. Hatcher, 58 Mo. l. c. 239; Larimore v. Bobb, 114 Mo. l. c. 453.]

There are other questions in the case we deem immaterial.

We think the prisoner should be remanded to the

custody of the sheriff. To rule otherwise would countenance disrespect to an officer, an arm of the court, performing his proper duty, and would strike down the good purposes of the statutes. It is our order that petitioner pay the costs of this proceeding and be remanded to the custody of the sheriff. On this record, he can get relief by testifying, not by *habeas corpus.* All concur, except *Valliant, C. J.,* who is absent.