JAMES DORF ET AL. *v.* SANDRA J. SKOLNIK ET AL.

[No. 153, September Term, 1976.]

*Per Curiam Order January 28, 1977.*

*Opinion Filed April 11, 1977.*

102

## PER CURIAM ORDER

For reasons to be stated in an opinion to be filed subsequently, it is this 28th day of January, 1977

ORDERED, by the Court of Appeals of Maryland, that the decree of the Circuit Court of Baltimore City, dated January 19, 1977, enjoining the Governor of Maryland "from appointing ... James Dorf as a member of the House of Delegates of the General Assembly of Maryland, from the 42nd Legislative District of Baltimore City, *as the nominee of the Democratic State Central Committee of the 42nd Legislative District of Baltimore City,*" is affirmed (emphasis added); and it is further

ORDERED that the mandate of this Court shall issue forthwith, costs to be paid by the appellants.

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Joseph F. Murphy, Jr.,* and *Richard D. Rosenthal* for James Dorf et al. and by *George A. Nilson, Deputy Attorney General,* for Governor of Maryland, appellants.

*James A. Rothschild* and *Kenneth A. Reich,* with whom was *H. Robert Erwin, Jr.,* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

We shall here give the reasons for the per curiam order we filed in this matter on January 28, 1977. We there affirmed

the determination of a trial judge (Proctor, J.) that one of the appellants, Jayme Dorf (Miss Dorf), is no longer a member of the Democratic State Central Committee for the 42nd Legislative District and, as a consequence, that the Governor of Maryland might not appoint the nominee of that committee, as such nominee, to fill a then existing vacancy in the Maryland House of Delegates.

The scenario begins with the death of Murray Abramson, a longtime member of the House of Delegates from the 42nd Legislative District, a district entirely within Baltimore City. See Maryland Code (1957, 1971 Repl. Vol., 1976 Cum. Supp.) Art. 40, § 47 (pp) and *In Re Legislative Districting*, 271 Md. 320, 333, 317 A. 2d 477 (1974), as to the boundaries of that district. Maryland Constitution Art. III, § 13 (a) provides in pertinent part:

"In case of death ... of any person who shall have been chosen as a Delegate ... the Governor shall appoint a person to fill such vacancy from a person [sic] whose name shall be submitted to him in writing, within thirty days after the occurrence of the vacancy, by the State Central Committee of the political party with which the Delegate ... , so vacating, had been affiliated in the ... District from which he or she was elected, provided that the appointee shall be of the same political party as the person whose office is to be filled; and it shall be the duty of the Governor to make said appointment within fifteen days after the submission thereof to him. If a name is not submitted by the State Central Committee within thirty days after the occurrence of the vacancy, the Governor within another period of fifteen days shall appoint a person, who shall be of the same political party as the person whose office is to be filled, and who is otherwise properly qualified to hold the office of delegate ... in the District ...."

At a meeting of the Democratic State Central Committee for the 42nd Legislative District the vote was two to one for the recommendation to the Governor of one individual, with

Miss Dorf being one of the majority. Hence, if she were not properly a member of the committee, then no valid recommendation was made to the Governor and he was free, by reason of the expiration of time for the committee to make a recommendation, to appoint a person of his choice.

Appellees, Sandra J. Skolnik et al., as residents and registered voters of the 42nd Legislative District and also as Maryland taxpayers, filed a bill of complaint in the Circuit Court of Baltimore City seeking a declaratory judgment as to whether Miss Dorf continued to be a member of the Democratic State Central Committee for the 42nd Legislative District and thus whether a valid nomination of a member of the House of Delegates had been made. On January 19, 1977, the chancellor determined that she was no longer a resident of Baltimore City and therefore no longer a member of the committee. Accordingly, he enjoined the Governor from appointing the person nominated by the committee to the House of Delegates as the nominee of the committee. Of course, his order did not prevent the appointment of such person other than as the committee nominee. An immediate appeal was entered to the Court of Special Appeals. We granted the writ of certiorari prior to a hearing in that court. We advanced the matter for argument and heard it on January 21. At that time the proceedings in the trial court had not been transcribed. We delayed issuing our per curiam order until a transcript of those proceedings had been delivered to us and each of us had had an opportunity to examine that transcript. Our per curiam order of affirmance was issued on January 28.

The parties entered into the following stipulation in the trial court:

### STIPULATION

No. 1 - Jayme Dorf was elected in September, 1974, to the State Central Committee of the Democratic Party for the 42nd Legislative District.

No. 2 - She read and signed under the penalties of perjury in 1974 Maryland return, joint exhibit

No. 1, showing her residence as 2506 Shelleydale Drive.

No. 3 - She read and signed under penalties of perjury in 1974 Federal return, exhibit No. 2, showing residence as 2506 Shelleydale Drive.

No. 4 - She read and signed under penalties of perjury in 1975 Maryland return, exhibit No. 3, showing residence as 1809 Rambling Ridge Lane and showing "residence on last day of taxable period" as Baltimore County, and further that she paid her piggy-back taxes to Baltimore County.

No. 5 - She read and signed under penalties of perjury in 1975 Federal return, exhibit No. 4, showing residence as 1809 Rambling Ridge Lane, and the return further showed residence for purpose of revenue sharing as Baltimore City.

No. 6 - Her residential lease was signed May 1, 1975, for a year and renewed May 1, 1976, at 1809 Rambling Ridge Lane, exhibit No. 5.

No. 7 - She had a tenant homeowners insurance policy with Aetna Insurance Company, effective June 28, 1976, and issued by James H. Pollack on 1809 Rambling Ridge Lane, which was not "business" insurance, exhibit No. 6.

No. 8 - Her Maryland driver's license which was issued December 10, 1975, is to the address 1809 Rambling Ridge Lane, exhibit No. 7.

No. 9 - Her personal checks on the Equitable Trust Company account are printed with the address 1809 Rambling Ridge Lane, and they are sent to that address.

No. 10 - Her newspaper subscription is to the Baltimore Sunday Sun which is delivered to 1809 Rambling Ridge Lane.

No. 11 - All charge accounts, utility bills and other bills are sent and addressed to 1809 Rambling Ridge

Lane. These are set forth in the Judge's opinion. These are a combination of mixed personal and business accounts and include the following: American Express, BankAmericard, Master Charge, Amoco, Exxon, Shell, Lord & Taylor's, Stewart's, Field's Pharmacy, Bloomingdale's, Wanamaker's, Hess Apparel, Washington, D. C. Shopper's plate, Baltimore Shopper's plate, and B. Altman.

No. 12 - Her current telephone listing in the white pages of the metropolitan Baltimore phone book is 1809 Rambling Ridge Lane. She has no other listing in the white pages or yellow pages of the Baltimore metropolitan phone book or any other phone book.

No. 13 - Miss Dorf has signed a new lease effective February 1, 1977, on an apartment at 1131 University Boulevard, Silver Spring, Maryland. Exhibit 8.

No. 14 - Her voter registration is at 2506 Shelleydale Drive, Baltimore, Maryland, and was effective March 3, 1972. This was joint Exhibit No. 9.

No. 15 - She filed for candidacy for the Democratic National Convention in 1976 showing her address as 2506 Shelleydale Drive, Baltimore City, joint Exhibit No. 10.

No. 16 - She has a joint account with Mrs. Paul A. Dorf for checking, saving and safe deposit box showing an address of 2506 Shelleydale Drive.

No. 17 - The University of Maryland Alumni Office shows her address as 2506 Shelleydale Drive.

No. 18 - There is an automobile, 1974 Buick, which is yellow, which is used by Miss Dorf, insured with a fleet policy registered to her father, Paul A. Dorf, 2506 Shelleydale Drive.

Miss Dorf testified in the trial court that: she has a lease for the apartment mentioned in Baltimore County; she keeps

certain furniture, cooking utensils and cosmetics there; her automobile is kept there "[m]aybe a few times a week," possibly as much as four times a week overnight, whenever she has need to be there, on which occasions she herself was at the apartment, unless she had left the vehicle there when out of town; she has had male friends pick her up at that address; she has invited friends socially to the apartment; she has a dog which she keeps at this address when present; she has spent less than half of the weekends for the previous year at the Baltimore County apartment; she had "renter's insurance" at the apartment and was aware when she signed up for this insurance that there was a stipulation to the effect that such insurance was to be used only for residential units; she contemplates moving from the Baltimore County address to an address in Montgomery County; the furniture in question was furniture she had used when a student at the University of Maryland at College Park, from which institution she was graduated in May 1975; she kept clothing and cosmetics at the home of her parents and in the Montgomery County home of the woman with whom she was associated in business; that she herself is a manufacturer's representative covering "a territory from Richmond to Philadelphia, selling [and] servicing accounts"; she took the lease at the apartment in Baltimore County because she "needed some place to keep [her] furniture" and "[i]t is also a custom of the trade to have an apartment, because of the fact that [one] need[s] a place for business correspondence, for office materials and live merchandise" as well as "a lot of forms and units, promotional materials, and it is convenient because of the hours that [she] do[es] work and the times that [she is] away"; she has a telephone answering service at the apartment which records all incoming calls; she is not registered to vote in any place except in Baltimore City; she has never had any "intention of being a resident of Baltimore County," nor was it ever her intention to move away from her family home in Baltimore City; her new address in Montgomery County will be for business purposes only; her place of worship is Greenspring Valley Synagogue located in Baltimore City, and she has never changed her synagogue or other place of worship.

Testimony was presented from other tenants of the apartment complex, Miss Dorf's mother, and the woman associated with Miss Dorf in business, all of whose testimony was consistent with that which we have previously summarized from Miss Dorf herself.

Maryland Code (1957, 1976 Repl. Vol.) Art. 33, § 11-1 (a) specifies that "[e]ach political party which is required to nominate its candidates for public office by means of a primary election . . . shall adopt a permanent constitution and bylaws." [1] Section 5-1 requires any political party "with which ten per centum or more of the registered voters of this State are affiliated . . . [to] nominate (1) all its candidates for public office; and (2) all members of the State and local central committees in said political party" by primary election. Thus, the Democratic party is mandated to have a party constitution. Art. V of the Constitution of the Democratic party is concerned with local central committees. A requirement of its § 2 is, "No one shall be elected a member of such committee who is not a bona fide resident and registered Democrat of said election jurisdiction." Code Art. 33, § 11-2 (b) requires that party central committee members "shall be selected as provided in [that] Article." The General Assembly by Chapter 905 of the Acts of 1976 amended subsections (b) and (e). Prior to the amendment subsection (e) provided that the tenure in office of any member of the committee should "begin at the time the canvass of the votes in [the] district is completed and . . . sh[ould] be deemed to be continued to the extent of any extension in time between primary elections by reason of any change in the date of holding primary elections by political parties in this State." The 1976 amendment added to subsection (b) the proviso, "Upon relinquishing his residency within that county or Baltimore City a member of a party central com-

---

1. Prior to the revision of the election laws by Chapter 392 of the Acts of 1967 by which the present § 11-1 (a) was enacted no such statutory requirement existed. Code (1957) Art. 33, § 82 (d) provided merely that "[t]he party central committee for the State of any party shall determine its own rules of procedure, not inconsistent with the provisions of [that] article."

mittee shall be considered to have resigned." The provisions in subsection (e) relative to tenure were amended by stating, "However, upon relinquishing his residency in the county or Baltimore City, as the case may be, a member of a party central committee shall be considered to have resigned."

Questions presented to this Court, in the order in which we shall deal with them, are: (1) whether this controversy is one cognizable by the Court or is, to use the language of Mr. Justice Frankfurter in *Colegrove v. Green*, 328 U. S. 549, 556, 66 S. Ct. 1198, 90 L. Ed. 1432 (1946), a "political thicket" which we should not enter; (2) whether the action here is one which may be maintained in equity or whether the proper remedy is one at law by way of mandamus; (3) whether if Miss Dorf is no longer a resident of the 42nd Legislative District this vacates her office as a member of the party central committee for that district; and (4) whether the chancellor erred in his determination that Miss Dorf is in fact no longer domiciled in the 42nd Legislative District.

1. The "political thicket"

Maryland courts crossed the Rubicon in this matter in *Valle v. Pressman*, 229 Md. 591, 185 A. 2d 368 (1962). In that instance the Democratic candidate for State's Attorney of Baltimore City died subsequent to the primary election and before the general election. Before the Court was the validity of the selection by the Democratic State Central Committee of Baltimore City of a person as the nominee for that party at the ensuing general election. This Court affirmed a determination that the selection made was not valid. As Judge Hammond put it for the Court, "Each of the defendants demurred on the grounds that a court of equity had no power or right either to determine an election or political contest or to try title to office . . . ." In the process of holding that the complainants had "stated a cause of action of which equity had jurisdiction," he said for the Court:

"We think the demurrers were overruled properly. The general rule that a court of equity

may not decide election contests or interfere in political controversies is not inflexible and lately has been considerably relaxed. See *Maryland Committee for Fair Representation v. Tawes,* 228 Md. 412, following *Baker v. Carr,* 369 U. S. 186, 7 L. Ed.2d 663. *Soper v. Jones,* 171 Md. 643, held that a court of equity had jurisdiction of a taxpayer's suit to enjoin the Secretary of State from certifying the name of a candidate because of his failure to comply with statutory requirements as to signature. Chief Judge Bond referred to the general rule that equity will not decide election cases and said for the Court: 'But a contention that no controversy that affects elections may be heard and decided by the Court would be at odds with other decisions,' and cited cases in equity in which jurisdiction had been entertained, such as *Carr v. Hyattsville,* 115 Md. 545 (a bill to invalidate a referendum election on a local act); *Graf v. Hiser,* 144 Md. 418 (a bill to declare a referendum election invalid as improperly held); and *Sun Cab Co. v. Cloud,* 162 Md. 419 (a bill to restrain the holding of a referendum election because the signatures seeking it did not meet constitutional requirements). Judge Bond went on to point out that in the *Sun Cab* case a distinction was drawn between 'interferences by the courts with the political conduct of elections, and taking jurisdiction of a question whether persons assuming to avail themselves of the election machinery set up for private initiative are persons entitled under the law to do so.'

"In *Hammond v. Love,* 187 Md. 138, a mandamus case, this Court said that administrative or official decisions and actions in regard to the elective process which are arbitrary or contrary to law are subject to review by the courts. In *Mayor & Town Council of Landover Hills v. Brandt,* 199 Md. 105, 107, Judge Henderson for the Court restated earlier

holdings that the statute which says the judges of the circuit courts and of the Superior Court of Baltimore City should decide contested elections in certain cases (now Code (1957), Art. 33, Sec. 145) does not confer jurisdiction in equity, and said: 'Nor would equity have inherent jurisdiction in the absence of fraud, or arbitrary or illegal action.' The Court affirmed the chancellor's action in recounting the ballots because the case could have been removed from equity to law and heard before the same judge. Other cases involving matters pertaining to elections in which equity has acted and in which no question of its right to do so was raised include *Wilkinson v. McGill*, 192 Md. 387; *Nutwell v. Supervisors of Election*, 205 Md. 338 (bill to nullify action of a State Central Committee in certifying a nominee); *Lexington Park, etc. v. Robidoux*, 218 Md. 195." *Id.* at 594-96.

The Court was again involved in the "political thicket" in *Black v. Bd. of Supervisors*, 232 Md. 74, 191 A. 2d 580 (1963), although this time without a contest as to the right of the courts to be so involved. There the Republican candidate for City Comptroller of Baltimore City had resigned and the issue before the Court included, among other things, whether the vacancy might be filled with a registered Democrat even though he had been an unsuccessful candidate for that office in the preceding primary election.

The holding in *Valle* disposes of the contention that the controversy here is not one cognizable by the courts.

### 2. Whether the action may be maintained in equity

It is true, as appellants here contend, that our predecessors on occasion have stated that a court of equity might not determine whether a person might properly hold an office, that the proper course of action was at law by way of mandamus. We regard the portion of *Valle* which we have quoted as dispositive of this point. To *Valle* we would add that all of the holdings cited by the appellants are prior to

the enactment in this State of the Uniform Declaratory Judgment Act, now found in Code (1974) § 3-401 to 415, Courts and Judicial Proceedings Article.

In *Ryan v. Herbert*, 186 Md. 453, 458-59, 47 A. 2d 360 (1946), and *Schultz v. Kaplan*, 189 Md. 402, 407, 410, 56 A. 2d 17 (1947), Chief Judge Marbury and Judge Collins, respectively, discussed for the Court changes wrought by the passage of that act, specifically, the declaration by way of a preamble by the General Assembly in its reenactment by Chapter 724 of the Acts of 1945. In *Schultz* the action was brought at law. The appellant contended that the declaration in the case was "really in form and substance a bill in equity and that the procedure in [the] case [was] of an equitable nature." The court found issues properly cognizable by a court of law.

First of all, it might be said that although membership on a political committee is governed by statute, it is not a public office, as our predecessors held in *Usilton v. Bramble*, 117 Md. 10, 82 A. 661 (1911), in what must have been one of the first cases to reach this Court after the enactment of the direct primary law and the requirement that party central committee members be elected at such primaries. The Court there held that a statute requiring "[e]very candidate for public office" to file a report of campaign expenses and an attendant provision that no person should be deemed elected "to any elective office" until he had filed such statement was not applicable to a member of the Democratic State Central Committee for Kent County so as to void a selection made by members of that committee to fill a vacancy on the ballot. This Court held specifically "that the Legislature did not intend to include committeemen in the expression 'candidate for public office,' if that expression could otherwise have been said to include them." Be that as it may, we deem it entirely too late in the 20th century to bar sought for relief in an action of this kind upon the premise that it should have been brought in one of the law courts of Baltimore City rather than in one of the equity courts or, in one of the counties of Maryland, on the law side

of the docket rather than on the equity side of a circuit court.

### 3. Effect of change of residence

Appellants rely on *Salamanca Township v. Wilson*, 109 U. S. 627, 3 S. Ct. 344, 27 L. Ed. 1055 (1883), for the proposition that if Miss Dorf is no longer a resident of Baltimore City this does not vacate her membership on the committee. The question there was whether service of a summons upon the last elected and qualified treasurer of a township after his removal to an adjoining township was good and sufficient service of the summons. The Court said it was not denied that the service was good if he were in law the treasurer of the township when served. It held that there was nothing in the Constitution or laws of the State of Kansas which required the treasurer to be a resident or voter in the township when elected and qualified and thus nothing which vacated the office if the officer removed from the township during the term for which he was elected. It pointed out that "[j]ustices of the peace are township officers, and as to them it is expressly provided that they 'shall reside and hold their office in the township for which they shall have been elected.'" The Court then went on to say in holding that removal by the township treasurer did not vacate his office:

"As no similar provision is made in respect to any other township officer, the implication necessarily is that actual residence in the township is not required of them. *Expressio unius est exclusio alterius.* That residence, as a qualification for office, was in the minds of the framers of the Constitution and of the legislature is apparent, for art. 3, sec. 11, of the Constitution, provides that all judicial officers 'shall reside in their respective townships, counties, and districts during their respective terms of office;' art. 2, sec. 4, that 'no person shall be a member of the legislature who is not at the time of his election a qualified voter of, and resident in, the county or district for which he is elected;' and sec. 218 [1643] of the general

statutes (Dassler's Comp. Laws, 311), that 'ceasing to be an inhabitant of the county for which he was elected or appointed' vacates the office of a county officer." *Id.* at 628-29.

Under the reasoning of the Supreme Court it would seem to follow that since here a person was required to be a resident of the district when elected that subsequent removal from the district would vacate the office.

The cases generally hold that when residence is a prerequisite to a given office then a change of residence vacates that office, absent a legislative expression to the contrary. *See, e.g., State ex rel. Repay v. Fodeman,* 30 Conn. Sup. 82, 300 A. 2d 729, 730 (1972); *State v. McDermott,* 52 Idaho 602, 608, 17 P. 2d 343 (1932); *Yonkey v. State,* 27 Ind. 236, 241 (1866); *Independent Sch. Dist. v. Miller,* 189 Iowa 123, 132, 178 N. W. 323 (1920); *State ex rel. Johnston v. Donworth,* 127 Mo. App. 377, 380, 105 S. W. 1055 (1907); *Richman v. Blank,* 45 N.J. Super. 272, 278, 132 A. 2d 331 (1957); *Williams v. Commonwealth,* 116 Va. 272, 81 S. E. 61 (1914); and *State ex rel. Attorney General v. Messmore,* 14 Wis. 163, 170 (1861). *State ex rel. Fugina v. Pierce,* 191 Wis. 1, 3, 209 N. W. 693 (1926), citing *Messmore,* is authority for the fact that when a statute by its language provides qualifications for an office at the time of election or appointment "such qualification is a continuing one; that is, it must subsist during the entire term of office." Likewise, in *People v. Leonard,* 73 Cal. 230, 234-35, 14 P. 853 (1887), the effect of the holding was that the word "eligible" in a statute meant a person's capacity to hold office as well as to be elected to office. *See also State ex rel. Coe v. Harrison,* 217 Ala. 80, 81, 114 So. 905 (1927), and *State of Ohio ex rel. v. Orr,* 61 Ohio St. 384, 385, 56 N. E. 14 (1899). Also, F. Mechem, *The Law of Public Offices and Officers* § 438 (1890), states, "Where the law thus requires the officer to reside within the district which he represents, and *a fortiori* so where it expressly declares that his removal from the district shall create a vacancy, a permanent removal from the district represented will be deemed an abandonment of the office and a vacancy will result."

Although case law supports a determination that if Miss Dorf is no longer domiciled in the district from which she was elected a vacancy has been created, we regard our determination here to be governed by the 1976 statutory enactment to which we have previously referred and that series of Maryland cases which hold that "[w]here the office is of legislative creation, the Legislature can modify, control or abolish it, and within these powers is embraced the right to change the mode of appointment." This quotation is taken from *Calvert County v. Monnett*, 164 Md. 101, 105, 164 A. 155 (1933), where Chief Judge Bond quoted those words for the Court from *Anderson v. Baker*, 23 Md. 531, 627 (1865). In *Davis v. State*, 7 Md. 151, 161 (1854), our predecessors made exactly the same statement. *See also* the other cases cited by the Court in *Calvert County*.

It follows that if the General Assembly may abolish an office of its creation, then there is no vested right in an office of other than constitutional stature which would prevent changing the qualifications of office during the term. We thus hold that the 1976 enactment is applicable and that if Miss Dorf is no longer a resident of the legislative district from which she was elected, she has vacated the office.

### 4. Miss Dorf's domicile

In *Bainum v. Kalen*, 272 Md. 490, 497-99, 325 A. 2d 392 (1974), Judge Eldridge recently reviewed for this Court our prior holdings on this subject. They may be summarized: the words "reside" or "resident" mean "domicile" unless a contrary intent is shown. A person may have several places of abode or dwelling, but he can have only one domicile at a time. Domicile has been defined as the place with which an individual has a settled connection for legal purposes and the place where a person has his true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he has, whenever he is absent, the intention of returning. The controlling factor in determining a person's domicile is his intent. One's domicile, generally, is that place where he intends it to be. The determination of his intent, however, is

not dependent upon what he says at a particular time, since his intent may be more satisfactorily shown by what is done than by what is said. Once a domicile is determined or established a person retains his domicile at such place unless the evidence affirmatively shows an abandonment of that domicile. In deciding whether a person has abandoned a previously established domicile and acquired a new one, courts will examine and weigh the factors relating to each place. This Court has never deemed any single circumstance conclusive. However, it has viewed certain factors as more important than others, the two most important being where a person actually lives and where he votes. Where a person lives and votes at the same place such place probably will be determined to constitute his domicile. Where these factors are not so clear, however, or where there are special circumstances explaining a particular place of abode or place of voting, the Court will look to and weigh a number of other factors in deciding a person's domicile. As Judge Eldridge put it for the Court in *Bainum:*

> "These include such things as: the paying of taxes and statements on tax returns; the ownership of property; where the person's children attend school; the address at which one receives mail; statements as to residency contained in contracts or other documents; statements on licenses or governmental documents; where furniture and other personal belongings are kept; which jurisdiction's banks are utilized; membership in professional, fraternal, religious or social organizations; where one's regular physicians and dentists are located; where one maintains charge accounts; and any other facts revealing contact with one or the other jurisdiction." *Id.* at 499.

In reviewing the determination by the chancellor here we must be governed by Maryland Rule 886 to the effect that where an action has been tried without a jury we will review the case upon both the law and the evidence, "but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous . . . ." This rule is

applicable even when a trial judge does not have the opportunity to see and hear the witnesses as, for instance, when testimony is before a court examiner. *R.E.C. Management v. Bakst Serv.*, 265 Md. 238, 254, 289 A. 2d 285 (1972), and *Sewell v. Sewell*, 218 Md. 63, 71, 145 A. 2d 422 (1958). Thus, it is applicable to the determination made by the chancellor here from that portion of the evidence stipulated to by the parties as well as to the live testimony before him.

We do not have here a single person who has maintained some clothes and other effects at the home of her parents, although spending most of her time at some point distant therefrom by reason of employment or schooling, who is arguing that the home of her parents is her domicile or place of permanent abode. We have a person living in the apartment in question located but a matter of minutes by automobile from the home of her parents. Thus, the location of the apartment was mandated by neither employment nor schooling, either of which might constitute "special circumstances" for a single person such as Miss Dorf. We have a statement made under penalty of perjury on her 1975 income tax return that her residence on the last day of the taxable period was Baltimore County and that therefore her "piggy-back" income tax should be paid to that county. Her insurance policy on her personal effects in the apartment is inconsistent with a contention that the apartment was for business purposes only. Her Maryland driver's license showed the Baltimore County address, as does each of the 15 charge accounts or credit cards enumerated in the stipulation. Given that background, we find the judgment of the chancellor not to have been clearly erroneous when he concluded that she had abandoned her domicile at the home of her parents and had established a home of her own in Baltimore County. Thus, it follows that he was correct in holding that she had ceased to be a member of the Democratic State Central Committee for the 42nd Legislative District and that by virtue of that fact no valid nomination was made by that committee to the Governor for the vacancy then existing in the Maryland House of Delegates.