646 A.2d 1021

Nina NNOLI

v.

Emmanuel NNOLI.

Nos. 1253 and 1303, Sept. Term, 1993.

Court of Special Appeals of Maryland.

Aug. 31, 1994.

Alan Meiselman, Rockville, for appellant.

Emmanuel Nnoli, Washington, DC (Brian F. Lee of Rockville, on the brief), for appellee.

Argued before WILNER, C.J., and BISHOP, MARVIN H. SMITH, (Retired, Specially Assigned), JJ.

SMITH, Judge.

We have here two appeals. Emmanuel Nnoli and Nina Nnoli are husband and wife. Nina Nnoli appeals from her husband's release from incarceration on his petition for habeas corpus. We shall reverse that judgment in number 1253. Emmanuel Nnoli appeals a trial judge's refusal to abate a contempt order and to release him forthwith from incarceration in order to afford him the ability to comply with the

purging provision of the order. We shall affirm that judgment in number 1303.

## I.

These parties have been here before. *See Nnoli v. Nnoli,* 96 Md.App. 803 [1993]. In our earlier opinion, we said:

The parties, both of whom are Nigerian nationals, married on 7 July 1980 in Stillwater, Oklahoma. Two children were born of the marriage, Audrey Nnoli (now eleven years of age), and Eileen Nnoli (now nine years of age). The children enjoy dual citizenship in the United States and in Nigeria.

In January 1987 the parties jointly decided to send the two children to Nigeria to stay with their maternal grandparents until the summer of 1987. In January of 1988, Mr. Nnoli traveled to Nigeria and, without Mrs. Nnoli's consent, removed the children from the residence of her parents and placed them in his parents' home in Nigeria. He then returned to Maryland and resumed marital cohabitation with Mrs. Nnoli until September 1988.

On or about 13 September 1988, Mrs. Nnoli traveled to Nigeria and attempted to remove the children from the care of her husband's parents. Mrs. Nnoli was denied access to the children and was thus unable to remove the children. She returned alone to Maryland in October 1988, at which time she discovered that in her absence Mr. Nnoli had moved, sold the marital home, and discarded her possessions and clothing. . . .

At the time Mrs. Nnoli instituted the divorce proceeding, the Nnoli children had been in Nigeria for a period of twenty-one consecutive months, and had been regularly enrolled in and had attended Nigerian schools. [Footnote omitted.]

Emmanuel was found in contempt of court on April 21, 1992, for his failure to deliver custody of the parties' minor children to his wife, precipitating the earlier appeal. The divorce

action, we are informed, is still pending. On May 7, 1993, this Court affirmed the judgment of the circuit court.[1]

On May 13, 1993, Emmanuel was apprehended upon a body attachment and brought before the court. The trial judge (Miller, J.) at that time ordered Emmanuel remanded to the custody of the sheriff and incarcerated until he complied with the purging provision of the court's earlier contempt order, namely, the return of the children to Nina.

On June 11, 1993, Emmanuel filed several pleas including a motion for emergency hearing and a motion to abate the contempt order and to release him forthwith from incarceration in order to afford him the ability to comply with the purging provision of the order. A hearing was then held on June 30, 1993, before Judge Miller, the same trial judge who, on May 13, had remanded him to the custody of the sheriff and incarcerated him until he complied with the purging provision of the contempt order. He found that Emmanuel had conspired with his family to deprive Nina of ever seeing her children. He further found that Emmanuel was lying about his activities, both in Maryland and in Nigeria, both as to events in the past and the present. Incarceration was ordered to continue with the provision that Emmanuel would be released from custody when the minor children were produced. It is from that order that Emmanuel appeals.

On July 8, 1993, Emmanuel applied for a writ of habeas corpus before another Montgomery County circuit judge, Judge Ryan. The sole defendant named on that petition was Mrs. Nnoli. The hearing for that matter was held on July 13, 1993, before that judge. He ordered Emmanuel's release. Nina appeals.

At the hearing before Judge Miller on June 30, Emmanuel and Nina both testified and were subject to cross-examination. The only other evidence received at that hearing was affidavits

---

1. After hearing oral argument, the Court of Appeals dismissed, as improvidently granted, the writ of certiorari it had issued. *See Nnoli v. Nnoli,* 333 Md. 244, 634 A.2d 1329 (1994).

of Thomas L. Heeney, Esq., relating efforts and investigation he had made on behalf of Emmanuel. These were received over objection. Nina's counsel sought unsuccessfully to cross-examine Heeney.

■ At the conclusion of those proceedings Judge Miller said:

All right. In this case, I guess, since the children, I guess it was 1986, were voluntarily by the agreement of the parties sent to Nigeria, Mrs. Nnoli has not seen her children, and I think that's close to seven years, as I understand it, and from shortly after the time they got to Nigeria, it seems clear to this Court that there was a conspiracy between his family and Mr. Nnoli to make sure that Mrs. Nnoli does not see her children and never see[s] her children. And that is clearly demonstrated from the past behavior from Mr. Nnoli and what's happened in this case.

Mr. Nnoli now says in February of 1992 and July 1992 he went to Nigeria to try to retrieve the children to comply with this Court's order. *That's just a complete fabrication. That's not true.* The fact is at that time they were trying to get custody in the Nigerian courts. To suggest that Daniel Mahone was trying to get him to comply with this Court's order just is inconsistent with the actions of Daniel Mahone in this Court, where he tried to urge almost contemptuously the Nigerian law and that this Court had no jurisdiction.

Of course, as counsel points out, previous noncompliance does not make for a continued civil contempt. Let me make one observation. With respect to the law book standard of proof in this case, whether it's the preponderance of the evidence, clear and convincing, or beyond a reasonable doubt, I am not going to hold somebody in jail unless I am thoroughly convinced that they're in contempt, and [my] standard is going to be a standard beyond a reasonable doubt.[2]

---

**2.** All parties agree that the contempt in this case was civil. The standard the court used was incorrect. In *State v. Roll and Scholl,* 267

In this case, I'd give Mr. Heeney a lot of credit. He's made great efforts to try to get these children back, and certainly his good faith is not in issue. The question is Mr. Nnoli's good faith. *In the Court's opinion, he's lied about what's happened in the past and he's lying about what's happening right now.* [Emphasis added.]

At one point in the July 13 proceedings before Judge Ryan, where no testimony was heard but the court merely reviewed the prior proceedings, Judge Ryan said, "This man is a liar, outright liar. He hasn't told the truth totally about anything." At the conclusion of the case, he said:

Well, having reviewed the record in this case, I find that Judge Miller had sufficient facts in the record to support his decision and finding that the defendant, or Mr. Nnoli, was in contempt of Court for not complying to the previous order of the Court; that he was in contempt, because he had had the ability to comply, but willfully and deliberately did not comply, and thereby was found in contempt [of] Court.

I find that Judge Miller had sufficient findings at the time of finding Mr. Nnoli in contempt of Court to find that he had the present ability to purge himself and he took away the freedom of Mr. Nnoli until he did in fact purge himself, which he then had the present ability to do.

I find now that Mr. Nnoli, through basically efforts of Mr. Heeney and some on his own, has attempted to purge himself of his contempt, and I find that his efforts through his attorney are in good faith, and I find that he's been unable to purge himself of the contempt, and I find that he no longer has the present ability to purge himself of the contempt, so I'll order that he be released from confinement.

---

Md. 714, 728, 298 A.2d 867 (1973), Judge Digges said for the Court: "[A] civil contempt need be proved only by a preponderance of the evidence, while a criminal contempt must be shown beyond a reasonable doubt. *Winter v. Crowley,* 245 Md. 313, 226 A.2d 304 (1967); *Donner v. Calvert Distillers Corp.,* 196 Md. 475, 77 A.2d 305 (1950)." Because Judge Miller used a stricter standard in this case than required, the error is harmless.

## II.

On the morning of argument, we were informed that Mr. Nnoli had been adjudged a bankrupt the previous day and that he was claiming an automatic stay.

The automatic stay provision in the U.S.Code is 11 U.S.C. § 362. Subsection (a) of § 362 provides in part:

Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 ... operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title....

Subsection (b)(2) provides that the automatic stay does not apply to the "collection of alimony, maintenance, or support from property that is not property of the estate...." Subsection (b) also provides certain exceptions when the action involves a government entity. Subsection (b) does not otherwise prevent the automatic stay from applying to civil actions that do not involve government entities when the debtor's property is not involved.

The effect of the automatic stay on a pending suit in another court is to suspend that suit; it does not cause that suit to be dismissed. *David v. Hooker, Ltd.,* 560 F.2d 412, 418 (9th Cir.1977). Further, the stay does not necessarily suspend every aspect of the pending suit. *Id.* One aspect of a pending suit that an automatic stay will not suspend is a contempt proceeding, provided that the contempt proceeding is to protect the dignity of the court. *Id. See also Stovall v. Stovall,* 126 B.R. 814, 815 (N.D.Ga.1990); *US Sprint Communications Co. v. Buscher,* 89 B.R. 154, 156 (D.Kan.1988). The language used by the court in *U.S. Sprint* is instructive.

While the issue before the court is not whether a civil contempt judgment would be dischargeable, as was the case in [*In re*] *Marini,* [28 B.R. 262 (Bankr.E.D.N.Y.1983,]; [*In re*] *Gedeon,* [31 B.R. 942 (Bankr.D.Colo.1983) ], and [*In re*] *Corbly,* [61 B.R. 851 (Bankr.D.S.D.1986) ], the court finds the reasoning in those cases persuasive. The current Bankruptcy Code does not directly address the court's concern: whether a bankrupt may be sentenced on a civil contempt citation after he has violated direct orders of the court. At first glance, § 362(a)(1) does seem to stay this court's sentencing power because it halts any judicial proceeding. But this is not just any judicial proceeding. This court has already determined that defendant violated two direct orders of this court. It is within this court's inherent power to take whatever steps necessary to ensure those persons within its power comply with its orders. The court cannot conceive that Congress intended to strip the court of this power, and instead permit a party to blatantly violate direct orders of the court and then seek shelter from a bankruptcy judge. If this were so, the court's orders could be rendered almost meaningless. The court must retain the ability to compel compliance with its orders; a party seeking relief from his creditors is not free to run rampant in flagrant disregard of the powers of the court. A civil contempt judgment is one effective method of coercing compliance and of "upholding the dignity of the court."

*Id.* at 156 (footnote omitted).

We conclude that, under the reasoning of *U.S. Sprint,* Emmanuel Nnoli is not entitled to any stay at this time.

### III.

As we have previously indicated, in the habeas corpus action, Mrs. Nnoli was named as the party defendant. So far as we know, the uniform, but unwritten, practice in this State for generations has been to name as the party defendant the person allegedly depriving the petitioner of his liberty, the custodian. Accordingly, questions arose in our mind as to

whether the proceeding was even properly brought. 39A C.J.S. *Habeas Corpus* § 164(b) (1976) states: "The person in whose custody a prisoner is, and who has power to produce him physically, is the person against whom the writ should be sued out...." (Footnotes omitted.)

Habeas Corpus law in Maryland is governed by Maryland Rules Z40 *et seq.* Specifically, Md. Rule Z42(a), "Application—Form and Content," provides:

*In General.*

An application, in all cases, shall state:

(1) That the person in whose behalf the writ is applied for is confined or restrained in his liberty.

(2) The place where such person is so confined or restrained, if known.

(3) The name and official capacity, if any, of the person by whom he is so confined or restrained, if known, and if not, a description sufficient to enable identification of the person.

All of this was done. There is no provision in the Maryland Rules explicitly requiring the habeas corpus petitioner to name the person by whom he or she is confined as the respondent. The Rules only require that the petitioner's custodian must be named in the petition. Also, there does not appear to be any decision by a Maryland court determining when a party has standing to object to a petition for habeas corpus.

The standing of a party, other than the party confining the petitioner, to oppose a petition for habeas corpus has been discussed in several foreign jurisdictions. The Missouri Supreme Court addressed the issue in a civil contempt proceeding in *Ex parte Brockman*, 233 Mo. 135, 134 S.W. 977 (1911). The petitioner, Brockman, was determined to be in contempt for failing to give a deposition and ordered to be imprisoned until he gave the deposition. The parties who had filed suit against Brockman and attempted to depose him appeared in opposition to his petition for habeas corpus and his appeal of

the denial of his petition. Brockman objected to their participation in the habeas corpus action. The court responded:

> Below, as here, petitioner's counsel unavailingly objected to such appearance and now invites a ruling thereon. Cui bono? But waiving the view implied by that question, it is clear that appearance was either of grace or of right. On such premise we rule: (1) If such appearance was as amici curiae, and as a matter of grace, then that grace alone concerns us. Grace doth not abound through consent of one's adversary. It droppeth, withal, like mercy—as the gentle and refreshing dews of Heaven. It goeth where it listeth. (2) If that appearance below or here is because plaintiffs in the original suit are interested of right in this proceeding as auxiliary to and in aid of the principal suit (and counsel plant it on that theory), we can see no objection to it in reason. Fiat lux is a motto of universal and wholesome use. Commissioner Shields moved in the premises at the instance of the plaintiffs. They were interested then. When did that interest cease? Furthermore, over the objection of petitioner, made orally at our bar, we permitted such counsel to argue against petitioner's discharge and file briefs. For good or ill, the thing is done. How could we now, by any psychological twist known to man, wring from our minds the effect of that argument and those briefs? Yet nothing less than that impossible thing would benefit petitioner a whit. The incident must be taken as closed.

*Id.* 134 S.W., at 982.

The Arkansas Supreme Court held that when a party is imprisoned on criminal contempt charges, the opposing party in the underlying civil action had no interest in, and no standing to oppose, the petitioner's habeas corpus action; the court, however, did indicate that such an interest might exist if the contempt were civil in nature in *Ex parte Boles,* 88 Ark. 388, 114 S.W. 918 (1908). Specifically, the court stated:

> In this case the proceedings sought to be quashed were instituted for the purpose of relieving Kelley of imprisonment imposed upon him as a punishment for contempt, the

term of which was fixed at five days. The attachment and commitment of Kelley were a criminal proceeding.... There was no condition that he should be relieved on production of the ballots. There was nothing in the proceeding of a civil nature which formed any basis for Boles to claim the right to be heard. The habeas corpus proceeding involved the liberty of Kelley, and in that Boles had no interest which made it admissible to make him a party.

*Id.* 114 S.W., at 919.

The issue has also been addressed by several federal courts. If a petition for habeas corpus is filed in federal courts, there is a requirement that the petitioner name his or her custodian as the respondent. 1 James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 10.1 (1990). *See also Katz v. King,* 627 F.2d 568, 573 n. 5 (1st Cir.1980) ("Because this is a habeas corpus proceeding, the defendants in the civil action are not proper parties. The matter [a habeas corpus proceeding to determine the validity of *criminal* contempt charges] is now a dispute between [petitioner] and the Commonwealth of Massachusetts.") Nevertheless, other parties may still have standing to oppose the petition; a party's standing to oppose a federal habeas corpus petition is determined by the federal intervention rule, Rule 24. *See Trigg v. Moseley,* 433 F.2d 364 (10th Cir.1970); *State of Arizona v. Hunt,* 408 F.2d 1086, *cert. denied,* 396 U.S. 845, 90 S.Ct. 81, 24 L.Ed.2d 95 (6th Cir.1969); *Mir v. Smith,* 521 F.Supp. 446 (N.D.Ga.1981).

The Maryland Rule for intervention, Rule 2–214, is substantially similar to Federal Rule 24. *Maryland Radiological Society, Inc. v. Health Services Cost Review Comm'n,* 285 Md. 383, 388 n. 5, 402 A.2d 907 (1979) ("In the absence of Maryland authority, the similarity of Maryland Rule 208 [now Maryland Rule 2–214] and Federal Rule 24 makes the decisions of the federal courts interpreting their rule of considerable precedental value in construing our rule."); *Citizens Coordinating Committee on Friendship Heights, Inc. v. TKU Assocs.,* 276 Md. 705, 712, 351 A.2d 133 (1976). Thus, if Nina had not been

named as the respondent on Emmanuel's petition for habeas corpus, her standing would be determined by whether she could intervene under Maryland Rule 2–214. As no Maryland appellate court has addressed when a party may intervene in a habeas corpus proceeding, the federal cases serve as persuasive authority on this issue.

In *Mir*, the issue was whether Florida had a right to intervene in a habeas corpus action brought by Cuban nationals imprisoned in a federal penitentiary in Atlanta, Georgia. 521 F.Supp. at 448. Florida argued that it had a *right* to intervene under Fed.R.Civ.P. 24(a) or, in the alternative, that the court should *permit* it to intervene under Fed.R.Civ.P. 24(b). *Id.* The court characterized Florida's interest in the case as "that only properly screened, releasable and sponsored detainees be settled in Florida," (footnote omitted) and stated that "Florida must demonstrate a ' "direct, substantial, legally protectable interest in the proceedings." ...' " *Id.* The court held Florida had no *right* to intervene, stating, "Florida's interest is far too remote to keep any person in jail simply because Florida is not satisfied that a detainee won't travel to Florida and commit a crime" and "[t]his Court has no doubt whatsoever that any interest Florida may have in the careful screening of detainees before release is being *zealously* protected by federal respondents." *Id.* at 449 (emphasis in original). The court also denied Florida's motion for permissive intervention, finding Florida's intervention would both delay and prejudice the Cuban nationals. *Id.* Florida, however was permitted to participate as an *amicus curiae*. *Id.* at 450.

In *Hunt*, Arizona sought to extradite Hunt from Michigan to Arizona. The sixth circuit affirmed the decision allowing Arizona to intervene in Hunt's habeas corpus action, stating, "[w]hile the formal parties to an habeas corpus proceeding are initially the petitioner ... and the respondent custodian of the petitioner ..., the real party in interest in extradition proceedings is the demanding state...." *Hunt*, 408 F.2d at 1092. The authority on which the court based its decision was

Fed.R.Civ.P. 24(b), the federal rule for permissive intervention.

In *Trigg,* the State of Tennessee lodged a detainer against Trigg while he was imprisoned in the Leavenworth penitentiary in Kansas based on a warrant charging him with armed robbery. Trigg filed a petition for habeas corpus to have the detainer removed from his file. A prosecuting attorney for Shelby County, Tennessee, was allowed to intervene in Trigg's habeas corpus action. Trigg objected to the intervention. The tenth circuit affirmed, stating "the district court did not abuse its discretion in permitting the intervention," and indicated that the intervention was a Rule 24(b) permissive intervention. *Trigg,* 433 F.2d at 366.

■ In the case at bar, Nina's *right* to intervene would be determined by whether she "claims an interest relating to the . . . transaction that is the subject of the action, and [she] is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest unless it is adequately represented by existing parties." Md. Rule 2–214(a)(2). Clearly, Nina has an interest in the habeas corpus proceeding, which is the return of her children. The court that found Emmanuel in contempt essentially found that it was likely that Nina would never see her children again if Emmanuel were released. As to whether Nina's interest is protected by other parties, as it now stands, that interest is not protected by others. Of course, had Emmanuel named someone other than Nina as the respondent, then the result might well be different.

In this case, Nina was in fact named as the party defendant. We think it clear that she would have had the right to intervene. Thus, we regard her as a proper party to raise the issues that she has raised on her appeal from the habeas corpus action.

### IV.

■ In analyzing a habeas corpus court's authority to release a prisoner held on a contempt charge, it is necessary to first look at the contempt charge itself.

A civil contempt proceeding is intended to preserve and enforce the rights of private parties to a suit.... These proceedings are generally remedial in nature and are intended to coerce future compliance. Thus, a penalty in a civil contempt must provide for purging.

*State v. Roll and Scholl,* 267 Md. 714, 728, 298 A.2d 867 (1973). *See also Middleton v. Middleton,* 329 Md. 627, 643, 620 A.2d 1363 (1993). Imprisonment on a civil contempt charge can be avoided if a party no longer has the *"present* ability" to purge. *Elzey v. Elzey,* 291 Md. 369, 374, 435 A.2d 445 (1981).

Judge Miller found Emmanuel in contempt of court and ordered that he be imprisoned until he had his children returned to their mother; Judge Miller found that Emmanuel had the ability to do this.

When a party is committed for contempt, that party is *"convict and in execution on legal process." Ex–Parte Maulsby,* 13 Md. 625, 634 (1859). The *Maulsby* opinion was authored by Judge Bartol of the Court of Appeals in his capacity as a judge of the State of Maryland, under the authority of Chapter 125 of the Acts of 1809.[3] It was not an opinion of the Court of Appeals, appearing in the appendix to 13 Md., but has been cited over the intervening years.

Judge Bartol defined contempt as follows:

A contempt is an offense at the common law; it is not created by the Act of 1853, nor is the jurisdiction to punish it conferred by that Act alone. "It is an offense against the court, as an organ of public justice. The right of punishing for contempts by summary conviction is inherent in all courts of justice and legislative assemblies, and is essential for their protection and existence. It is a branch of the common law, adopted and sanctioned by our State Constitution."

---

**3.** Under Maryland Code (1974, 1989 Repl.Vol.), § 3–701 of the Courts and Judicial Proceedings Article, a petition for habeas corpus today may be addressed to an appellate judge.

*Id.* at 635. He then indicated that a court's ability to release a party imprisoned for contempt under a writ of habeas corpus was, for the most part, limited to an inquiry into the committing court's jurisdiction:

[I]f it appear *that the party is convict and in execution by legal process* [*i.e.*, committed for contempt], by the terms of the Act of 1809, he is denied the benefit of the writ [of habeas corpus]. If the return so state, it is doubtless competent, under the Act of 1813, to controvert its truth, and to show that no judgment or execution in fact exists, or that the judgment was by a court having no jurisdiction to pronounce it; but if it appear, that there is judgment by a competent court, then no proof can be received, nor any inquiry instituted, to determine that the judgment is erroneous.

*Id.* at 637 (emphasis in original).

*See also People Ex Rel. Lobenthal v. Koehler,* 129 A.D.2d 28, 516 N.Y.S.2d 928, 930 (1 Dept.1987), where the court stated:

The general rule has been that habeas corpus is available for one held pursuant to a commitment for contempt, the sole questions being whether the committing court had jurisdiction and whether the form of commitment is proper. Thus, the writ of habeas corpus traditionally would not lie to review errors and irregularities other than those of jurisdiction and form.

However, the concept of "jurisdiction" has not been given a uniformly rigid application by the courts. Thus, where procedural errors in the course of a trial are so basic and fundamental as to result in a deprivation of due process, even though the court has apparent jurisdiction, such basic errors will void the jurisdiction and authorize the use of habeas corpus under certain circumstances.

*Id.* 516 N.Y.S.2d at 930 (citations omitted).

Judge Bartol noted "It is always competent to inquire whether any thing has arisen since the commitment to put an end to the imprisonment, as a pardon, or an expiration of the

term fixed by the commitment." *Maulsby,* 13 Md. at 641 (citation omitted). He further noted "[I]f by an event subsequently happening ... it becomes impossible for him to obey the court's process, it must result from necessity that term of the imprisonment imposed is ended, and that the party is entitled to be discharged; otherwise the imprisonment would be perpetual." *Id. See also Elzey,* 291 Md. at 376, 435 A.2d 445 and *Ex parte Chennault,* 776 S.W.2d 703, 704 (Tex.App.—Texarkana 1989) holding, "[a] judgment of contempt is void and habeas corpus therefore proper if the conditions for purging the contempt are impossible of performance."

■ Thus, using *Maulsby* as authority, on Emmanuel's petition for habeas corpus, it was proper for Judge Ryan to determine whether the happening of subsequent events made it impossible for Emmanuel to purge himself of contempt.[4] *In Ex parte Barnes,* 730 S.W.2d 46 (Tex.App.—San Antonio 1987), the husband was jailed for contempt because he failed to pay his child support obligations; he filed a petition for habeas corpus which was denied. The husband appealed that decision and the appellate court remanded for a hearing to determine the husband's present ability to pay. That hearing established that the husband did not have a present ability to pay the child support arrearages. The court ordered that the husband be released from custody, stating "it is apparent that keeping a person until he performs an act which is beyond his power to perform is no more acceptable when the inability arises after he is imprisoned than it would be if the inability existed at the time the imprisonment began." *Id.* at 47. The court then cited *Ex parte Ramzy,* 424 S.W.2d 220 (Tex.1968) and stated:

> The significant feature of the case is that the Supreme Court considered both the evidence produced at the contempt hearing and that introduced at [a subsequent] hear-

---

4. None of the cases that Nina cited for the proposition that a habeas corpus court cannot consider new evidence involved contempt charges. This is significant because imprisonment under civil contempt requires that a prisoner have the *present* ability to purge.

ing. The Supreme Court found that relator was unable to comply with certain of the purge conditions and upheld the commitment order only as to those purge conditions which were within relator's power to perform. It is clear that we are not limited to a consideration of the evidence introduced at the contempt hearing but may consider the evidence at the subsequent hearing ordered by this Court.

*Id.*

Thus, Judge Ryan was not restricted to the evidence produced at the hearing where Emmanuel was found to be in contempt. If that were the case and subsequent events made it impossible for Emmanuel to purge himself of contempt, then he would be subject to indefinite imprisonment. That is contrary to the dictates of *Maulsby, Elzey,* 291 Md. at 376, 435 A.2d 445, and the above cited Texas cases.

The difficulty here, however, is that Judge Ryan heard no new evidence. He reached a different conclusion on the evidence that was before Judge Miller. He did not have the opportunity to see and hear the witnesses and, thus, judge their credibility, although, as we have already pointed out, he concluded that Emmanuel was a liar. He found "that Judge Miller had sufficient facts in the record to support his decision and finding that the defendant, or Mr. Nnoli, was in contempt of Court for not complying to the previous order of the Court" and "that Judge Miller had sufficient findings at the time of finding Mr. Nnoli in contempt of Court to find that he had the present ability to purge himself and he took away the freedom of Mr. Nnoli until he did in fact purge himself, which he then had the present ability to do."

We find no case law in Maryland saying how a judge sitting on a habeas corpus petition is to regard evidence concerning a prisoner's present ability to purge himself of contempt, heard by an earlier court which a habeas judge has not heard. However, the standard of review by the appellate courts in Maryland is that a judgment of a trial court based on the evidence is not to be set aside unless it is clearly erroneous. Maryland Rule 8–131(c). The Court of Appeals has gone so

far as to say that this applies in a case where the testimony was heard by an examiner and not by the court itself. *Davis v. Davis*, 280 Md. 119, 124, 372 A.2d 231, *cert. denied*, 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), *reh'g denied*, 434 U.S. 1025, 98 S.Ct. 754, 54 L.Ed.2d 774 (1978); *Dorf v. Skolnik*, 280 Md. 101, 117–18, 371 A.2d 1094 (1977).[5] The standard for review of the action of an administrative agency, by way of analogy, is whether a reasoning mind could have reached the conclusion which the administrative agency reached. *State Ins. Comm'r v. National Bureau of Casualty Underwriters*, 248 Md. 292, 309, 236 A.2d 282 (1967), and its numerous progeny. We hold that Judge Ryan erred in concluding upon the evidence heard by Judge Miller, but not heard by Judge Ryan, that Emmanuel lacked the present ability to comply with the court's order, a decision directly contrary to that reached by Judge Miller who heard the evidence and had the opportunity to observe the demeanor of the witnesses.[6]

---

**5.** The roles of examiners and masters should not be confused. An examiner merely swears witnesses, records their testimony, and submits it to the court, which must decide the issues presented. A master makes recommendations to the court. This difference may be readily perceived by reference to the old Maryland work E. Miller, *Equity Procedure* (1897). In section 209, the author states, "An examiner is an officer of the court, appointed by circuit courts in the counties, and by the supreme bench in Baltimore City, for the purpose of taking testimony within the jurisdiction of the court appointing him.... The examiner shall not have power to decide upon the competency, materiality or relevancy of any question proposed or evidence elicited, nor as to the competency or privilege of any witness offered." On the other hand, in section 555, a master is described as "an officer of the court who acts as an assistant to the [judge]." In section 556, it is stated, "The master is an adviser of the court as to matters of jurisdiction, parties, pleading, proof and in other respects where he may be of assistance to the court.... The duties of the master are of an advisory character only. He decides nothing, but merely reports to the court the result of his examination of the proceedings, with a suggestion as to the propriety of the court passing a decree. The report of the master in the absence of exceptions is usually received by the court as correct and the court passes such a decree as the master may certify to be proper."

**6.** Nina has strongly contended in her brief that the Heeney affidavits should not have been considered as evidence both on the basis of the hearsay rule and the fact that she was denied the opportunity to cross-

## V.

Emmanuel discharged his attorney who represented him in the circuit court. In this Court he appears pro se, but his brief has all the earmarks of having been prepared by someone with legal knowledge.

In Emmanuel's appeal, he contends that the court abused its discretion and denied him due process rights. It is simply a rehash of contentions that Judge Miller erred in reaching the conclusion which he reached on the basis of the evidence before him. Judge Miller heard the testimony. He had the opportunity to observe the demeanor of the witnesses. He concluded that Emmanuel was a liar and said so. We find no error.

## VI.

Emmanuel argues that Judge Miller erred when he "conditioned the release of [Emmanuel] on actions of foreign parties with 'no minimum contact' with forum." He cites cases such as *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); and *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), which he says "protect[ ] the defendant against the burdens of litigating in a distant or *inconvenient forum*." These cases deal with the so-called "long arm statute" applicable to civil litigation in other contexts. We perceive no error on the part of Judge Miller in this regard.

## VII.

In his reply brief, Emmanuel contends that Nina's "appeal must fail for other additional reasons," an attempt to once again argue the jurisdictional issue. He cites the *"Parental Kidnapping Prevention Act,"* the *"Hague Convention on the Civil Aspects of International Child Abduction,"* among other citations. What he does not seem to understand

---

examine Heeney. In the view we take of this case, we express no opinion upon the propriety of admitting the Heeney affidavits.

is that the jurisdictional aspects of this matter were decided by this Court in *Nnoli v. Nnoli*, 96 Md.App. 803 [1993]. That is the law of the case and we will not hear him further on the jurisdictional issue. The fact that he did not raise some of the points that he now raises on jurisdiction is of no moment. The earlier decision is the law of the case.

## VIII.

At almost the last minute before argument, Emmanuel filed a motion to supplement the record, which was opposed by Nina. She then moved to strike the appendix to Emmanuel's brief. We grant Emmanuel's motion and deny Nina's motion.

**JUDGMENT IN NO. 1253, THE APPEAL OF NINA NNOLI REVERSED; JUDGMENT IN NO. 1303, THE APPEAL OF EMMANUEL NNOLI AFFIRMED; EMMANUEL NNOLI TO PAY THE COSTS IN BOTH CASES.**